### IN THE UNITED STATES DISTRICT COURT
### FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JOHN F. ANTHONY, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 10-145 Erie |
| | ) | |
| v. | ) | |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

### MEMORANDUM OPINION

McLAUGHLIN, SEAN J., District Judge.

## I.      INTRODUCTION

John F. Anthony ("Plaintiff"), commenced the instant action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), seeking judicial review of the final decision of the Commissioner of Social Security ("Commissioner"), denying his claim for supplemental security income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1383f.  Plaintiff filed his application on February 28, 2006, alleging disability since birth due to cystic fibrosis (AR 120-126; 135).[1]  His application was denied (AR 91-94), and following a hearing held before an administrative law judge ("ALJ") on May 29, 2007 (AR 36-88), the ALJ found that Plaintiff was not disabled at any time through the date of his decision, and therefore was not eligible for SSI (AR 15-22; 486).  Plaintiff's request for review by the Appeals Council was denied (AR 1-4), rendering the Commissioner's decision final under 42 U.S.C. § 405(g). The instant action challenges the ALJ's decision.  Presently pending before the Court are the parties' cross-motions for summary judgment.  For the reasons that follow, Plaintiff's motion will be denied and the Commissioner's motion will be granted.

---

[1] References to the administrative record [ECF No. 4], will be designated by citation "(AR __)".

## II.   BACKGROUND

Plaintiff was 19 years old on the date of the ALJ's decision, has a high school education and no past relevant work experience (AR 20).

Plaintiff was treated by David M. Orenstein, M.D., a pulmonary specialist, at the Children's Hospital of Pittsburgh for his cystic fibrosis (AR 256-271). In 2001, Dr. Orenstein noted that Plaintiff was doing "very well," his activity level had been "excellent," and he was "doing beautifully" (AR 387). He recommended no treatment changes (AR 387). Throughout 2002 Plaintiff continued to do "very nicely" with respect to his cystic fibrosis (367; 375; 378).

Plaintiff was also seen at Saint Vincent Sports Medicine by Jonathan McKrell, M.D. (254-255). Treatment notes dated February 19, 2002 reflect a diagnosis of cystic fibrosis, pancreatic insufficiency and a history of GERD (AR 254). It was noted that Plaintiff was doing "extremely well" with "essentially no pulmonary symptoms" and that his appetite remained "good" and his pulmonary function test results were "excellent" (AR 254). At the end of 2002 and during 2003, Plaintiff was seen by Dr. McKrell for various complaints such as pain secondary to an auto accident, white spots on his face and a sore in his nose (AR 364; 357; 347).

Plaintiff returned to Dr. McKrell on April 29, 2004, who reported Plaintiff was "doing very well" with increased activity levels and had not been hospitalized in three years (AR 252). He noted that Plaintiff was able to wrestle and that it "went very well" (AR 252). Plaintiff's medications consisted of pancreatic enzymes, Singulair, Advair, and Atrovent as needed (AR 252). His physical examination was unremarkable and Dr. McKrell found that his GERD symptoms were controlled with medication (AR 252).

Plaintiff continued to treat with Dr. McKrell throughout 2004 for various complaints unrelated to his cystic fibrosis, including a dog bite, shoulder pain, rashes and ring worm. (AR 243-251). Plaintiff continued to wrestle despite his complaints of shoulder pain (AR 247). In October 2004, Plaintiff contracted a cold from a friend and developed a significant cough (AR 243). On physical examination, Plaintiff was not in respiratory distress, and he was prescribed antibiotics (AR 243).

2

In 2005, Plaintiff returned to Dr. McKrell for follow-up and complained of a lump on his chest (AR 241). On physical examination, Dr. McKrell noted that Plaintiff was in no acute distress, and other than the lump on his chest, his physical examination was unremarkable (AR 241). On January 27, 2005, Plaintiff reported that he had not "felt ill" and denied any shortness of breath, cough, chills, nights sweats, fatigue or weight loss (AR 238). X-rays of his ribs dated January 27, 2005 revealed no evidence of acute rib fracture or other bony abnormalities (AR 240). On February 17, 2005, it was noted that Plaintiff had no problems with wrestling, his general health had been good and there were no problems with his cystic fibrosis (AR 236).

Plaintiff contracted the flu, and at his office visit on March 3, 2005, Dr. McKrell reported that Plaintiff had done "remarkably well" with his cystic fibrosis, and had participated in a "very competitive" wrestling career while in high school (AR 230). Plaintiff reported that while the antibiotics prescribed by Dr. Orenstein had helped his flu symptoms, he complained of shortness of breath and chest heaviness (AR 230). Plaintiff was looking forward to a planned trip to Florida (AR 230). Dr. McKrell reported on physical examination that Plaintiff did not appear acutely ill and his lungs were clear, but he exhibited significant expiratory wheezes with deeper breath and forced expiration (AR 230). Upon consultation with Dr. Orenstein, it was decided that Plaintiff would be admitted for a course of intravenous antibiotics in order to improve his pulmonary function to enable him to travel to Florida (AR 230-231).

Plaintiff was seen by Dr. Orenstein on July 28, 2005 and described himself as "excellent" with an "amazing" energy level and huge appetite (AR 270). Plaintiff was wrestling, lifting weights and swimming (AR 270). He reported that he coughed very little and that his gastrointestinal symptoms were well controlled (AR 270). On physical examination, Dr. Orenstein reported that his chest diameter was normal, there were no retractions and his lungs were clear (AR 270). Pulmonary function testing showed only "mild small airways obstruction" (AR 271). Dr. Orenstein felt Plaintiff was "doing very nicely" but because throat cultures in the past revealed the presence of MRSA, he prescribed an antibiotic to be inhaled for the next month (AR 271).

Plaintiff returned to Dr. Orenstein's office on September 22, 2005 and was seen by Kathleen Godfrey, RN, CRNP (AR 266-269).  Plaintiff complained of a recurrence of his cough, significant shortness of breath, wheezing and chest discomfort (AR 266).  He reported that he had been lifting weights and working out in preparation for wrestling, but had been unable to run (AR 266).  Plaintiff reported normal bowel movements, but complained of "terrible" heartburn (AR 266-267).  On physical examination, his breath sounds were remarkable for scattered inspiratory and expiratory polyphonic high-pitched wheezes with good air movement throughout (AR 267).  Plaintiff's pulmonary function testing revealed that he had a moderate to severe degree of lower airways obstruction, which Dr. Orenstein found was markedly decreased from his usual studies (AR 268).  It was noted that Plaintiff usually had normal lung function (AR 268).  He was prescribed an oral steroid course and an antibiotic to cover a suspected staph infection (AR 268).

On October 6, 2005, Dr. Orenstein noted that Plaintiff was doing worse despite his recent course of medication (AR 264).  Physical examination revealed tenderness of Plaintiff's sternum and rib cage, and his lung fields were clear to auscultation (AR 263).  His pulmonary function tests showed some improvement (AR 264).  Dr. Orenstein decided to admit Plaintiff to the hospital for intravenous antibiotic treatment (AR 264).

Plaintiff was hospitalized from October 10, 2005 until October 28, 2005 as a result of exacerbation of his symptoms related to cystic fibrosis (AR 283-288).  He was administered a course of antibiotics and was "subjectively and clinically well" upon discharge (AR 287).  He reported that his chest pain had improved and his blood sugars were well controlled (AR 287).  In addition to his regular medication regimen, he was given a home regimen of insulin and one month of double antibiotic therapy (AR 287).

On November 10, 2005, Dr. Orenstein reported that Plaintiff was doing considerably better following his discharge from the hospital (AR 260).  Plaintiff's breathing was "much better," he had "zero" cough, less chest pain and had been able to work out for wrestling (AR 260).  His gastrointestinal symptoms were "well controlled" (AR 260).  His pulmonary function tests showed mild small airways obstruction (AR 261).  Dr. Orenstein found that Plaintiff was

4

"much improved" and continued his antibiotic therapy but decreased his steroid dosage (AR 261).

Plaintiff was seen by Ingrid Libman, M.D., an endocrinologist, on December 14, 2005 (AR 296-298). Plaintiff had been diagnosed with diabetes in October 2005, and reported that his symptoms had improved since starting insulin therapy (AR 281; 297). It was noted that he participated in wrestling daily with no energy level difficulties (AR 297). Plaintiff did, however, complain of some abdominal discomfort and vision difficulties (AR 297). His physical examination was unremarkable and he was assessed with cystic fibrosis related diabetes (AR 298). Dr. Libman noted that his symptoms were "very well-controlled" with no hypoglycemic episodes or trends (AR 298). She continued his insulin regimen (AR 298).

Plaintiff returned to Saint Vincent Sports Medicine on January 28, 2006 complaining of a facial lesion (AR 214). He was assessed with a facial infection, most likely staph, and was continued on antibiotics (AR 214). On January 30, 2006, Dr. McKrell noted on physical examination that Plaintiff was well hydrated, well developed, well nourished and in no acute distress (AR 212). He was diagnosed with impetigo and released to return to wrestling (AR 212). On February 2, 2006, Dr. McKrell prescribed an antibiotic for a suspected herpes zoster outbreak following Plaintiff's participation in a wrestling match (AR 210-211). By February 6, 2006, Plaintiff's condition had improved while on antibiotics (AR 208).

On February 9, 2006, Plaintiff returned to Dr. Orenstein and reported that he was doing much better and denied any coughing, shortness of breath or chest pain (AR 257). Plaintiff had no gastrointestinal complaints, reporting a good appetite with normal bowel movements (AR 257). Dr. Orenstein noted that Plaintiff had been busy wrestling and was planning on attending college next year (AR 257). On physical examination, Dr. Orenstein found no retractions or coughing, percussion did not reveal any hyperresonance, and there was no wheezing, crackles or rhonci found on chest exam (AR 258). His pulmonary function test showed improvement from his last visit (AR 258). Dr. Orenstein stated that Plaintiff was doing reasonably well except for a few coughing episodes since his last visit and his blood sugars were under control (AR 258). His medications were adjusted and he was to return in two months (AR 258).

5

When seen by Dr. Orenstein on May 2, 2006, Plaintiff reported that he was "doing very well" and his exercise tolerance was "great, excellent, phenomenal" (AR 273). Plaintiff further reported that he continued to work out even though wrestling season was over (AR 273). Plaintiff stated that his breathing had been good with "zero" cough, his bowel symptoms were well controlled and his glucose levels had been "very good" (AR 273). Dr. Orenstein reported on physical examination that Plaintiff appeared "very well" and auscultation revealed clear lung fields (AR 274). Pulmonary function tests showed "very very mild small airways obstruction" (AR 274). Dr. Orenstein found Plaintiff was "doing beautifully" and adjusted his medications (AR 274).

On June 6, 2006, William Lester, a state agency adjudicator, reviewed the medical evidence of record and concluded that Plaintiff could perform medium work with no postural or manipulative limitations (AR 275-277). With regard to environmental limitations, Mr. Lester found Plaintiff should avoid concentrated exposure to extreme heat, extreme cold, wetness, humidity, fumes, odors, dusts, gases and poor ventilation (AR 278).

Plaintiff reported to Dr. McKrell on June 12, 2006 that he injured his left shoulder while lifting weights (AR 315). X-rays showed no evidence of fracture, dislocation, significant arthritic change or rotator cuff calcification (AR 317). Dr. McKrell suspected he suffered a subluxation episode and instructed him to perform range of motion exercises at home (AR 316).

Plaintiff was seen by Dr. Libman on June 19, 2006 for follow up of his diabetes (AR 292-295). Dr. Libman noted that Plaintiff was very active, weight lifting and working out every day, and had participated in wrestling until February (AR 293). Plaintiff reported that his diabetes management had been "going well" and his readings were within goal range (AR 293). His physical examination was unremarkable and he was encouraged to perform blood glucose readings prior to meals (AR 294).

Plaintiff was evaluated by Richard C. Blackford, Ph.D., on September 7, 2006 at the request of his grandmother (AR 410-411). Plaintiff reported that he was an active wrestler, had "outlived and outperformed everyone's expectations" and was "very active" (AR 410). He claimed he felt guilty over the financial and emotional cost of his treatment (AR 410). He

6

reported a history of cutting, as well as suicidal thoughts (AR 410).  Plaintiff reported that he was starting to struggle in college and had experienced a panic attack two weeks prior to the evaluation (AR 410).  On mental status examination, Plaintiff was fully oriented, exhibited an anxious and depressed mood, his speech was pressured and his thought process was "slightly confused" (AR 410).  Dr. Blackford found his judgment was "fair," his insight and impulse control were "fair to good" and his attention, concentration and memory were within normal limits (AR 410).  Dr. Blackford diagnosed Plaintiff with major depressive disorder, single episode, severe, without psychotic features, and panic disorder without agoraphobia (AR 411). He was assigned a current global assessment of functioning ("GAF") score of 55, and a GAF score of 70 for the past year (AR 411).[2]  Treatment plan goals were to avoid suicidal behavior, engage in no self-mutilation or punishment, improve mood independently, deal with anxiety, and talk to people about feelings rather than acting out (AR 411).  Plaintiff did not attend his appointment scheduled for September 18, 2006, and no further mental health treatment was documented (AR 411).

Dr. McKrell prepared a medical report dated September 25, 2006 (AR 281-282).  In this report, he recounted Plaintiff's medical history, noting that he had pulmonary manifestations of cystic fibrosis, as well as pancreatic manifestations (AR 281).  He indicated that Plaintiff has had frequent hospitalizations several times a year throughout his life and used multiple therapy modalities to manage the disease (AR 281).  Plaintiff also took digestive enzymes and vitamin supplements, and was on insulin therapy for his diabetes (AR 281).  Dr. McKrell indicated that Plaintiff's condition would "inexorably decline" requiring more care, and opined:

---

[2] The Global Assessment of Functioning Scale ("GAF") assesses an individual's psychological, social and occupational functioning with a score of 1 being the lowest and a score of 100 being the highest. The GAF score considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." *American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV-TR) 34 (4th ed. 2000).  An individual with a GAF score of 61 to 70 may have "[s]ome mild symptoms" or "some difficulty in social, occupational, or school functioning" but is "generally functioning pretty well."  *Id*.  An individual with a GAF score of 51 to 60 may have "[m]oderate symptoms" or "moderate difficulty in social, occupational, or school functioning."  *Id*.

> The multi-system progressive nature of cystic fibrosis will render John unable to maintain regular attendance at a job due to this disability and therefore unable to complete assigned responsibilities on a regular basis.  Managing this complex multi-system disease requires much daily energy, planning and time and is essentially a job unto itself.  I think that this would preclude regular and sustained employment activities.  I certainly believe that John is an appropriate candidate for SSI benefits due to the progressive multi-system nature of the cystic fibrosis and the necessarily complex regimen of care.

(AR 282).

Plaintiff returned to Dr. Libman on September 30, 2006 and reported that he was enjoying attending college (AR 289).  Other than one low level reading during the summer when he was more active, Plaintiff's blood sugar levels were in the appropriate ranges (AR 289).  Dr. Libman reported that Plaintiff was doing well with respect to his cystic fibrosis and had no recent exacerbations or hospitalizations, and that he continued to wrestle and work out every day (AR 289-290).  His physical examination was unremarkable, and Dr. Libman reported that his diabetes continued to be "in very good control" (AR 290).

On November 16, 2006, Plaintiff was seen by Dr. Orenstein who reported that Plaintiff was working out for two to three hours each day, and noted his "very impressive muscularity" (AR 405).  Physical examination revealed clear lung fields and a dry cough (AR 405).  Pulmonary function testing showed very mild, small airways obstruction, slightly decreased from his June 2006 visit, but he exhibited a positive response to the bronchodilator (AR 405).  Dr. Orenstein reported Plaintiff was doing "reasonably well" and that his symptoms most likely represented asthma and an airways infection (AR 405).  He temporarily increased his steroid dosage (AR 406).

Plaintiff saw Brent Walker, M.D., an eye physician, on January 18, 2007 for his complaints of dilated eyes (AR 403).  He was assessed with diabetes mellitus, type I without retinal complications (AR 403; 409).

Plaintiff was also seen by Dr. McKrell for bronchitis in January and February 2007 (AR 303-306).  On physical examination, his breathing was reported as normal, and no wheezing or

rhonchi were heard (AR 306).  Plaintiff requested a handicapped parking permit in January 2007 since he was having a "hard time" breathing in the winter while attending classes (AR 422).

Plaintiff returned to Dr. Orenstein on February 15, 2007 and reported that he was "doing well" except for sleep disturbances (AR 416).  He claimed he only had "good sleep" during a one-hour nap about twice a week (AR 416).  Plaintiff described his energy level as "not bad," stating that he worked out for one to one and one half hours five days a week performing "cardio" and lifting weights (AR 416).  He reported that he was having a "rough time" with his freshman year in college (AR 416).  Plaintiff had no physical complaints, stating that he had no cough, wheezing or shortness of breath, and his gastrointestinal symptoms were "well controlled" (AR 416).  He informed Dr. Orenstein that he was attempting to lose weight by decreasing junk food and increasing exercise (AR 416).  His physical examination was unremarkable, except Dr. Orenstein noted that he appeared "sad" and somewhat depressed (AR 416).  He stated that Plaintiff was doing better from a pulmonary point of view, and referred him to the Behavioral Medicine Department (AR 416).

On March 8, 2007, Plaintiff reported to Dr. McKrell that he was suffering from insomnia (AR 300).  He stated that his pulmonary health had been good and that college had been a positive experience, both academically and socially (AR 300).  Dr. McKrell reported that his respiratory movements were normal and he exhibited normal breath and voice sounds (AR 301).  Dr. McKrell suspected "idiopathic" insomnia and added a low dose of Elavil to his medication regimen (AR 302).

Plaintiff was hospitalized from July 8, 2007 to July 20, 2007 for cystic fibrosis exacerbation (AR 443-480).  Plaintiff was administered intravenous antibiotics and remained stable throughout his hospital stay (AR 443).  His pulmonary function tests showed gradual improvement and biweekly lab results remained unremarkable (AR 443).  His diabetes remained under good control (AR 444).  Plaintiff was discharged in stable condition (AR 444).

Plaintiff, his parents, his aunt and Elena Curchanick, a vocational expert, testified at the hearing held by the ALJ on May 29, 2007 (AR 36-88).  Plaintiff testified that he was a high school graduate and lived with his parents (AR 44).  Plaintiff stated that his cystic fibrosis caused

shortness of breath, fatigue and reoccurring bronchitis (AR 47; 57).  He indicated that his medication regimen consisted of aerosol treatments three to four times per day that took thirty minutes to one hour (AR 47).  He also wore a vest that helped his breathing, used an aerosol inhaler twice a day and took 75 to 100 pills per day (AR 47-48; 50; 54; 61).  He claimed his treatment regimen caused severe, crippling, stomach cramping; painful defecation and an inability to concentrate (AR 63; 66).  Plaintiff indicated that he also suffered from diabetes for which he took insulin and that it caused vision problems and headaches (AR 46).  He also claimed that he suffered from chronic fatigue, resulting in the need to nap every day for one to three hours (AR 64-65).

Plaintiff testified that he had no difficulty sitting, standing or walking, but could only lift a "very small amount" (AR 53).  Plaintiff stated that he had been advised to lift weights and exercise daily for at least twenty minutes for his continued health (AR 59-60).  He further stated that he had been an active participant in high school wrestling, wrestling in 30 matches his senior year (AR 52).  Plaintiff testified that he was home-schooled in order to avoid sickness (AR 51). He worked one summer at a health club and attended one year of college, but quit due to his health (AR 45; 55).  Plaintiff claimed his daily life did not allow time for gainful employment and his diabetes required that he stay on a strict schedule (AR 67-68).

Plaintiff's mother testified that his "whole day" was consumed with treatments and that he napped every afternoon (AR 74).  She further testified that Plaintiff became disoriented and was unable to concentrate because his coughing decreased his energy level (AR 75).  She claimed it was a full time job keeping Plaintiff healthy (AR 75).  Plaintiff's aunt testified that it took all day to care for Plaintiff, and that he was in and out of hospitals fighting infections (AR 79).  She indicated that Plaintiff suffered from daily fatigue and was too sick to engage in any activities (AR 79-80).  Plaintiff's father testified that Plaintiff had no endurance (AR 82).

The vocational expert was asked to assume an individual of the same age, education and work experience as Plaintiff, who was limited to sedentary work that did not expose the individual to poor ventilation or extremes of dust, humidity or temperature, that required no more than occasional contact with co-workers and supervisors, or any contact with the public (AR 84-

85).  The vocational expert testified that such an individual could perform the jobs of a surveillance system monitor, a document preparer and an assembler of small parts (AR 85).

Following the hearing, the ALJ issued a written decision finding Plaintiff was not entitled to SSI within the meaning of the Act (AR 15-22).  His request for an appeal with the Appeals Council was denied rendering the ALJ's decision the final decision of the Commissioner (AR 1-4).  He subsequently filed this action.

### III.    STANDARD OF REVIEW

The Court must affirm the determination of the Commissioner unless it is not supported by substantial evidence.  *See* 42 U.S.C. § 405(g).  Substantial evidence does not mean a large or considerable amount of evidence, but only "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood,* 487 U.S. 552, 564-65 (1988) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 1097, 229 (1938)); *see also Richardson v. Parales*, 402 U.S. 389, 401 (1971); *Ventura v. Shalala*, 55 F.3d 900, 901 (3rd Cir. 1995).  It has been defined as less than a preponderance of evidence but more than a mere scintilla.  *See Richardson*, 402 U.S. at 401; *Jesurum v. Secretary of the United States Dept. of Health and Human Servs.*, 48 F.3d 114, 117 (3rd Cir. 1995).  Additionally, if the ALJ's findings of fact are supported by substantial evidence, they are conclusive.  42 U.S.C. § 405(g); *Richardson*, 402 U.S. at 390.  A district court cannot conduct a *de novo* review of the Commissioner's decision or re-weigh evidence of record.  *Palmer v. Apfel*, 995 F. Supp. 549, 552 (E.D.Pa. 1998); *see also Monsour Medical Center v. Heckler*, 806 F.2d 1185, 90-91 (3rd Cir. 1986) ("even where this court acting *de novo* might have reached a different conclusion … so long as the agency's factfinding is supported by substantial evidence, reviewing courts lack power to reverse either those findings or the reasonable regulatory interpretations that an agency manifests in the course of making such findings.").  To determine whether a finding is supported by substantial evidence, however, the district court must review the record as a whole.  *See* 5 U.S.C. § 706.

### IV.    DISCUSSION

A person is "disabled" within the meaning of the Social Security Act if he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable

physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Commissioner uses a five-step evaluation process to determine when an individual meets this definition:

> In the first two steps, the claimant must establish (1) that he is not engaged in "substantial gainful activity" and (2) that he suffers from a severe medical impairment. *Bowen v. Yuckert*, 482 U.S. 137, 140-41 (1987). If the claimant shows a severe medical impairment, the [Commissioner] determines (3) whether the impairment is equivalent to an impairment listed by the [Commissioner] as creating a presumption of disability. *Bowen*, 482 U.S. at 141. If it is not, the claimant bears the burden of showing (4) that the impairment prevents him from performing the work that he has performed in the past. *Id*. If the claimant satisfies this burden, the [Commissioner] must grant the claimant benefits unless the [Commissioner] can demonstrate (5) that there are jobs in the national economy that the claimant can perform. *Ferguson v. Schweiker*, 765 F.2d 31, 37 (3rd Cir. 1985).

*Jesurum*, 48 F.3d at 117. The ALJ concluded that Plaintiff had not engaged in substantial gainful activity since his application date of February 28, 2006 (AR 17). The ALJ further found that his cystic fibrosis and diabetes were severe impairments, but determined at step three that he did not meet a Listing (AR 17-18). The ALJ found that he was able to perform sedentary work, except that he could not be exposed to poor ventilation or extremes of dust, humidity or temperatures; and could have no more than occasional contact with co-workers or supervisors and no contact with the public (AR 18). At the final step, the ALJ concluded that he could perform the jobs cited by the vocational expert at the administrative hearing (AR 21). In addition, the ALJ concluded that Plaintiff's statements concerning the intensity, persistence and limiting effects of his symptoms were not entirely credible (AR 486). The ALJ also found that Plaintiff's family members' contentions were not entirely consistent with Plaintiff's specific limitations (AR 19). Again, I must affirm this determination unless it is not supported by substantial evidence. *See* 42 U.S.C. § 405(g).

Plaintiff challenges the ALJ's step three analysis with respect to both his physical and alleged mental impairments. *See* [ECF No. 7] Plaintiff's Brief pp. 15-16. Step three requires a

determination of whether the claimant has an impairment or combination of impairments which meets or equals a listed impairment in Appendix 1, 20 C.F.R. § 416.920(d). The Listing of Impairments describes impairments which preclude an adult from engaging in substantial gainful activity without regard to his or her age, education or work experience. *Knepp v. Apfel*, 204 F.3d 78, 85 (3rd Cir. 2000). A claimant who meets or medically equals all of the criteria of an impairment listed in Appendix 1 is *per se* disabled and no further analysis is necessary. *Burnett v. Comm'r*, 220 F.3d 112, 119 (3rd Cir. 2000). The burden is on the claimant to present evidence in support of his or her allegation of *per se* disability. *Williams v. Sullivan*, 970 F.2d 1178, 1186 (3rd Cir. 1992).

Plaintiff argues that the ALJ erred in determining that his physical impairment did not meet or equal Listing 3.04C for cystic fibrosis. Listing 3.04C requires "[p]ersistent pulmonary infection accompanied by superimposed, recurrent, symptomatic episodes of increased bacterial infection occurring at least once every 6 months and requiring intravenous or nebulization antimicrobial therapy." 20 C.F.R. Pt. 404, Subpt. P, Appx. 1, § 3.04C. The ALJ examined the requirements of Listing 3.04 and concluded that it was not met since Plaintiff had not, *inter alia*, "experienced persistent pulmonary infections under the guidelines in paragraph C of that listing" (AR 18). I conclude that the ALJ's finding in this regard is supported by substantial evidence. For example, while Plaintiff did require IV antibiotic therapy on three occasions, these did not occur "once every 6 months." Plaintiff was hospitalized in March 2005 and October 2005 for IV therapy, but his next IV therapy did not occur until July 2007 (AR 230-231; 283-288; 443-480). Moreover, there is no indication that Plaintiff underwent nebulization antimicrobial therapy once every 6 months as alternatively required by the Listing. Finally, Plaintiff does not point to any specific medical evidence in the record that demonstrates his condition meets this Listing; rather, he simply repeats the Listing's requirements and claims that his condition meets it. *See* [ECF No. 7] Plaintiff's Brief p. 16.

Plaintiff further argues that his alleged mental impairment met Listing 12.04 (Affective Disorders) and/or 12.06 (Anxiety Related Disorders). *See* [ECF No. 7] Plaintiff's Brief pp. 15-16. In this case however, the ALJ did not reach step three of the sequential evaluation process

with respect to Plaintiff's alleged mental impairment since he concluded at step two that it did not significantly limit his mental ability to perform basic work related functions (AR 17).  As observed by the ALJ, Plaintiff had no significant mental health concerns prior to his evaluation by Dr. Blackford in September 2006 (AR 17).  In addition, his evaluation by Dr. Blackford was essentially unremarkable.  Although Plaintiff exhibited a depressed mood, his attention, concentration and memory were all reported within normal limits, and he was assessed with a GAF score of 70 for the past year, which indicated he was "generally functioning pretty well." *See American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV-TR) 34 (4th ed. 2000).  The ALJ further noted that Dr. Blackford described Plaintiff as "very active," and there was no indication that Plaintiff continued to receive any mental health treatment or that he used psychotropic medications (AR 17).  In short, Plaintiff presented no evidence that his alleged mental impairment imposed even a minimal impact on his ability to perform work-related activities and the ALJ's determination in this regard is supported by substantial evidence.  Because the ALJ's step two non-severity finding is supported by substantial evidence, it follows that the Plaintiff's mental impairment could not have met Listing 12.04 and/or 12.06 rendering him *per se* disabled.

Plaintiff further contends that the ALJ "arbitrarily dismissed" Dr. McKrell's opinion, failing to assign it the weight "it deserved," because the ALJ failed to "understand the nature of the disease." *See* [ECF No. 7] Plaintiff's Brief p. 17.  It is a cardinal principle guiding disability determinations that "the ALJ accord treating physicians' reports great weight, especially 'when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a long period of time.'" *Morales v. Apfel*, 225 F.3d 310, 317 (3rd Cir. 2000) (quoting *Plummer v. Apfel*, 186 F.3d 422, 429 (3rd Cir. 1999)) (citations omitted); *see also Adorno v. Shalala*, 40 F.3d 43, 47 (3rd Cir. 1994).  A treating source's opinion concerning the nature and severity of the claimant's alleged impairments will be given controlling weight if the Commissioner finds that the treating source's opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record. *Fargnoli v. Halter*, 247 F.3d 34, 43 (3rd Cir. 2001); 20

14

C.F.R. § 416.927(d)(2).  In choosing to reject a treating physician's opinion, an ALJ may not make "speculative inferences from medical reports" and may reject "a treating physician's opinion outright only on the basis of contradictory medical evidence" and not due to his own credibility judgments, speculation or lay opinion.  *Plummer*, 186 F.3d at 429; *Frankenfield v. Bowen*, 861 F.2d 405, 408 (3rd Cir. 1988) (holding that "the medical judgment of a treating physician can be rejected only on the basis of contradictory medical evidence" not "simply by having the administrative law judge make a different judgment"); *Moffat v. Astrue*, 2010 WL 3896444 at *6 (W.D.Pa. 2010) ("It is axiomatic that the Commissioner cannot reject the opinion of a treating physician without specifically referring to contradictory medical evidence.").  Finally, where an ALJ chooses to reject the opinion of a treating physician, he must adequately explain in the record his reason for doing so.  *See Sykes v. Apfel*, 228 F.3d 259, 266 (3rd Cir. 2000) ("Where the Secretary is faced with conflicting evidence, he must adequately explain in the record his reasons for rejecting or discrediting competent evidence.").

The ALJ recognized that Plaintiff suffered from the "serious, progressive disease of cystic fibrosis," but found that he was not precluded from performing a range of sedentary work based upon the medical evidence relative to his condition during the relevant time period (AR 486; 19).  The ALJ first noted that Dr. McKrell's opinion was not supported by his treatment note entries relative to Plaintiff's condition (AR 486).  He observed that in March 2007, Dr. McKrell found Plaintiff's "pulmonary health [had] been good," he was well nourished and his breath sounds were normal (AR 19).  He further noted that the medical record showed Plaintiff's cystic fibrosis related diabetes was stable in January 2007 (AR 19; 427).

The ALJ further found Dr. McKrell's opinion was contrary to the records of Plaintiff's treating pulmonologist, Dr. Orenstein, as well as his treating endocrinologist, Dr. Libman.  With respect to Plaintiff's cystic fibrosis, the ALJ observed that in November 2006, Dr. Orenstein noted Plaintiff was working out two to three hours per day, had "very impressive musculature," had only mild obstruction on pulmonary function studies, and concluded that Plaintiff was doing reasonably well (AR 19).  As of November 2007, Dr. Orenstein reported that Plaintiff was doing well except for some sleep difficulties and his energy level was satisfactory (AR 19).  Plaintiff

continued to work out four to five times per week and Dr. Orenstein reported that Plaintiff had no pulmonary complaints such as coughing, wheezing or shortness of breath (AR 19). The ALJ acknowledged that Plaintiff experienced an exacerbation of his cystic fibrosis requiring hospitalization in July 2007, but that his symptoms had only increased a few months prior to his hospitalization and he had responded well to treatment (AR 19).

With respect to Plaintiff's cystic fibrosis related diabetes, the ALJ found that the medical records showed his condition required only conservative medical management "with obvious good control" (AR 19). The ALJ pointed to Dr. Libman's records, Plaintiff's treating endocrinologist, who observed in September 2006 that Plaintiff was enjoying college and his diabetes was under good control (AR 19). The ALJ further observed that Plaintiff continued to maintain good glucose control throughout his hospitalization in July 2007 (AR 19). Dr. Libman consistently noted that Plaintiff's sugar levels remained very good, he needed only a "very small dose" of insulin before breakfast, and she consistently noted that Plaintiff's diabetes was "well-controlled" (AR 258; 273; 289-90; 292; 294; 298). The ALJ further found that Dr. Walker, Plaintiff's eye specialist, found no retinal complications resulting from Plaintiff's diabetes (AR 19).

The ALJ also noted that Dr. McKrell's opinion was inconsistent with Plaintiff's activities, citing *SSR* 96-2p. According to *SSR* 96-2p, "a treating source's medical opinion on what an individual can still do despite his or her impairments will not be entitled to controlling weight if substantial, non-medical evidence shows that the individual's actual activities are greater than those provided in the treating source's opinion." SSR 96-p2, 1996 WL 374188 at *4. The ALJ noted that Plaintiff had the ability to finish high school and attend college, and had the ability to participate in a regular wrestling program and other activities associated with physical fitness (AR 19). Plaintiff argues that these activities are required in order to maintain his health. *See* [ECF No. 7] Plaintiff's Brief p. 14. However, Plaintiff's level of physical fitness activities greatly exceeded the recommended twenty minutes for his continued health (AR 59-60). The record reflects that he worked out for one to three hours daily (AR 405; 416), suggesting a greater level of functioning than claimed. In sum, the ALJ adequately articulated

16

his reasons for rejecting Dr. McKrell's opinion and his findings are supported by substantial evidence.

Plaintiff next challenges the ALJ's credibility determination.  An ALJ must consider subjective complaints by a claimant and evaluate the extent to which those complaints are supported or contradicted by the objective medical evidence and other evidence in the record.  20 C.F.R. § 416.929(a).  Such other evidence includes the claimant's own statements, the claimant's daily activities, the treatment and medication the claimant has received, any statements by treating and examining physicians or psychologists, and any other relevant evidence in the case record.  *See* 20 C.R.R. § 416.929(c); *SSR* 96-7p, 1996 WL 374186 at *2.  The ALJ as the finder of fact can reject, partially or fully, subjective complaints if he finds them not credible based on other evidence in the record.  *See Baerga v. Richardson*, 500 F.2d 309, 312 (3rd Cir. 1974).  The ALJ is empowered to evaluate the credibility of witnesses and his determination is entitled to deference by this Court.  *See Van Horn v. Schweiker*, 717 F.2d 871, 873 (3rd Cir. 1983).

The ALJ found Plaintiff's statements, as well as the statements from his family, were not entirely credible (AR 19; 486).  In making his determination, the ALJ considered the medical evidence of record, as well as Plaintiff's testimony as to his functional limitations (AR 19-20). He noted that Plaintiff testified he experienced shortness of breath and fatigue, but the results of diagnostic pulmonary function tests and various examinations failed to disclose persistent patterns of shortness of breath or fatigue (AR 19).  The ALJ further noted that Plaintiff testified he had no difficulty sitting, standing or walking (AR 20).  While Plaintiff claimed he quit college due to his health, the ALJ found no significant worsening of his condition other than a brief exacerbation which occurred in July 2007 (AR 20).  The ALJ also found that the medical records did not support Plaintiff's contention that he required the constant use of medication or that his medications produced significant side effects (AR 20).  The ALJ observed that Dr. McKrell's records and Dr. Orenstein's records consistently revealed no serious gastrointestinal symptoms, and Dr. Orenstein noted in February 2007 that his symptoms were well-controlled (AR 20).  The ALJ recognized that Plaintiff's mother testified Plaintiff became disoriented, but he observed that he found no evidence to support this claim in the medical records (AR 20).  Finally, the ALJ

17

noted that while Plaintiff's aunt testified he had been in and out of the hospital, the medical record reflected only two hospitalizations since October 2005 (AR 20).

All of the above findings are supported by substantial evidence and I find no error in the ALJ's credibility analysis.

## V.     CONCLUSION

For the reasons discussed above, Plaintiff's motion for summary judgment will be denied and Defendant's motion for summary judgment will be granted.  An appropriate Order follows.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

JOHN F. ANTHONY,          )
                           )
               Plaintiff,     )      Civil Action No. 10-145 Erie
                           )
     v.                      )
                           )
MICHAEL J. ASTRUE,      )
Commissioner of Social Security,   )
                           )
            Defendant.   )

## <u>ORDER</u>

AND NOW, this 6th day of September, 2011, and for the reasons set forth in the accompanying Memorandum Opinion,

IT IS HEREBY ORDERED that Plaintiff's Motion for Summary Judgment [ECF. No. 6] is DENIED, and Defendant's Motion for Summary Judgment [ECF No. 8] is GRANTED. JUDGMENT is hereby entered in favor of Defendant, Michael J. Astrue, Commissioner of Social Security, and against Plaintiff, John F. Anthony.

The clerk is directed to mark the case closed.


                        s/ Sean J. McLaughlin
                          United States District Judge


cm:    All parties of record